**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| INTERTRUST TECHNOLOGIES CORP., *Plaintiff*, v. CINEMARK HOLDINGS, INC., *Defendant*, | § § § § § § § § § § § § | CIVIL ACTION NO. 2:19-CV-00266-JRG LEAD CASE |
| AMC ENTERTAINMENT HOLDINGS INC., *Defendant*, | § § § § § | CIVIL ACTION NO. 2:19-CV-00265-JRG MEMBER CASE |
| REGAL ENTERTAINMENT GROUP, *Defendant*. | § § § § § | CIVIL ACTION NO. 2:19-CV-00267-JRG MEMBER CASE |

**MEMORANDUM OPINION AND ORDER**

Before the Court is the Motion for Protective Order (the "Motion") filed by Defendants Cinemark Holdings, Inc., AMC Entertainment Holdings, Inc., and Regal Entertainment Group (collectively, the "Defendants"). (Dkt. No. 53.) The Court held a hearing on the Motion on May 4, 2020. Having considered the Parties' arguments and briefing on the Motion, the Court finds it should be and hereby is **DENIED**.

**I.   BACKGROUND**

**A. Procedural History**

On August 7, 2019, Intertrust Technologies Corporation ("Intertrust") filed a complaint for patent infringement against the Defendants alleging infringement of 11 patents—U.S. Patent Nos.

6,157,721; 6,640,304; 6,785,815; 7,340,602; 7,406,603; 7,694,342; 8,191,157; 8,191,158; 8,526,610; 8,931,106; and 9,569,627. (Dkt. No. 1, ¶ 4.)[1] Specifically, Intertrust's infringement allegations center around the implementation of the Digital Cinema Initiatives, LLC ("DCI") standards for digital cinema technology. (*Id.* ¶ 30.)

On February 6, 2020, Intertrust disclosed its intent to use Mr. Michael Karagosian as an expert in this case regarding "the fulfillment and exhibition aspects of the cinema industry from an industry and technical perspective." (Dkt. No 53 at 5; Dkt. No. 54, Decl. of Michael Karagosian, ¶ 2 [hereinafter Karagosian Decl.].) The Defendants objected to Intertrust's designation on February 16, 2020 stating they believed Mr. Karagosian had access to and received confidential information regarding the Defendants in his prior role as a consultant for the National Organization of Theatre Owners ("NATO")—an organization in which the Defendants are the three largest members.[2] (Dkt. No 53 at 5; Dkt. No. 59 at 1.) On February 24, 2020, Intertrust responded that it had investigated the Defendants' claims and found their objections to be without merit. (Dkt. No 53 at 5.) Accordingly, Intertrust continued to pursue designation of Mr. Karagosian as an expert and sought his admission to information covered by the Protective Order in this case. (*Id.*)

Thereafter, the Parties continued to meet and confer but were unsuccessful in resolving their disputes. (*Id.*) On March 13, 2020, the Defendants filed the Motion now before the Court seeking to disqualify Mr. Karagosian as an expert and to preclude disclosure of the Defendants' designated materials to Mr. Karagosian in the capacity of an expert witness. (Dkt. No. 53.)

---

[1] Citations are to the Docket Entries in Lead Case No. 2:19-cv-00266. However, to the extent there are Docket Entries cited prior to the Consolidation Orders (Dkt. Nos. 8, 22) in this case, the Docket Entries in the Member Cases correspond to the same operative documents and are substantially the same as those filed in the Lead Case.
[2] Though Defendants are the three largest companies within NATO's membership, the record shows that NATO has approximately 500 members, of which these Defendants are 3 of 500. (Karagosian Decl. ¶ 35.) NATO's remaining 497 (or so) members include may of their direct competitors. (*Id.* ¶ 38.)

### B. Findings of Fact as to Mr. Karagosian's Background and Involvement with NATO

In accordance with the evidence presented in this case, the Court makes the following findings of fact:

Prior to his engagement with NATO, Mr. Kargosian worked extensively in the cinema technology industry. (Karagosian Decl. ¶¶ 4–14.) Mr. Karagosian has experience working with companies like Dolby and Disney, and Mr. Karagosian has been the founder of two independent consulting firms that provide engineering services to the entertainment industry—MKPE Consulting founded in 1988 and The Cinema Group founded in 1994. (*Id.* ¶¶ 8, 10, 11, 13.) Since 1989, Mr. Karagosian has been a member of the Society of Motion Picture and Television Engineers ("SMPTE")—an international standard setting organization that has promulgated over 800 standards relating to broadcast, filmmaking, digital cinema, and related fields—and has continued to operate as an independent consultant since that time. (*Id.* ¶¶ 15–16.) Mr. Karagosian has served in leadership positions within SMPTE, and around 2000, Mr. Karagosian began serving as a committee chair for various SMPTE standards committees relating to digital cinema. (*Id.* ¶ 16.) It was during this time that Mr. Karagosian was retained, as part of his consulting firm MKPE Consulting, as an independent consultant for NATO to aid in the industry-wide transition from 35mm analog film to digital cinema—specifically the transition to the Digital Cinema System Specification ("DCSS") set forth by DCI. (*Id.* ¶¶ 20, 22, 26; Dkt. No. 53 at 2.) The standards set forth by DCI provide an overarching framework under which other standard setting organizations, like SMPTE, can provide guidance and standards relating to specific technologies. (Karagosian Decl. ¶ 22.) As part of this endeavor, DCI promulgated the DCSS, which references certain SMPTE standards that were developed by committees that Mr. Karagosian held membership in or

was the chairman. (*Id.* ¶¶ 22, 24.) As such, the work by DCI often intertwined with Mr. Karagosian's SMPTE standard setting work. (*Id.* ¶ 24.) Mr. Karagosian's role as an independent consultant for NATO, through MKPE was also directly impacted by his work for SMPTE and collaboration with DCI. (*Id.*) In fact, Mr. Karagosian's consultancy role with NATO mainly consisted of educating NATO and its members, including the Defendants "on what was happening with the digital standards development by DCI and SMPTE at the time and tak[ing] their feedback to the respective committees." (*Id.* ¶ 36.) The vast majority of Mr. Karagosian's consulting time with NATO was spent in group discussions with NATO members that Mr. Karagosian would later condense into reports that would either be distributed internally to NATO and its members or externally to DCI and SMPTE. (*Id.* ¶¶ 36–38.) In 2003, as part of Mr. Karagosian's engagement by NATO, MKPE signed a "Joint Defense and Confidentiality Agreement" ("JDCA") along with NATO, DCI, the Defendants, and each party's respective counsel. (*Id.* ¶ 33.) Mr. Karagosian attended one meeting conducted pursuant to the protections of the JDCA, but none of the information shared with Mr. Karagosian at that meeting related to the technical issues in this case, and all of the information presented in that meeting has since been made public. (*Id.* ¶ 34.) The JDCA was not submitted by the Defendants with their Motion and is not before the Court. Mr. Karagosian's consulting engagement with NATO ended in 2011. (*Id.* ¶ 35.) The Defendants themselves reached out to Mr. Karagosian regarding his ability to potentially serve as an expert witness for them in this case, but Mr. Karagosian declined. (*Id.* ¶ 46). Mr. Karagosian has never been engaged by any of the Defendants to be their representative or to perform consultancy work for any of the Defendant companies individually. (*Id.* ¶ 44.) Mr. Karagosian has solely been

involved with the Defendants in his role as a consultant for NATO.[3] (*Id.*)

## II. LEGAL AUTHORITY

Federal Courts have the inherent power to disqualify experts, although such power is rarely used. *Koch Ref. Co. v. Jennifer L. Boudreau M/V*, 85 F.3d 1178, 1181 (5th Cir. 1996). The Fifth Circuit has adopted a two-step analysis for determining whether an expert or consultant should be disqualified:

> (1) whether the opposing party had a confidential relationship with the expert; and
>
> (2) whether the opposing party disclosed confidential or privileged information relevant to the instant case to the expert.

*Id.* (citations omitted). The party seeking disqualification bears the burden of proving these elements, and only if both prongs are met should the expert be disqualified. *See id.* In making this determination, Courts may also consider public policy considerations like whether another expert is available and whether the opposing party has time to hire and prepare another expert before trial. *Id.* at 1183.

## III. ANALYSIS

### A. The Parties' Arguments

#### i. The Defendants' Arguments

The Defendants argue that Mr. Karagosian had a confidential relationship with the Defendants through his role as an agent for NATO and its members. (Dkt. No. 53.) The Defendants contend that Mr. Karagosian was their agent because: (1) he provided technical advice to NATO and its members; (2) he met with various NATO members regarding digital committees; (3) he served as NATO's technical liaison to DCI; (4) he prepared reports for NATO's members labelled

---

[3] In 2003, Mr. Karagosian signed a one-year Non-Disclosure Agreement with Regal Cinemedia—a separate and distinct company from Defendant Regal Entertainment. (Karagosian Decl. ¶ 32.) Mr. Karagosian's discussions under that Non-Disclosure Agreement did not pertain to any of the issues in this case. (*Id.*)

"This Report is Strictly Confidential—For NATO Member Use Only;" and (5) he was paid by NATO for the work done on behalf of its entire membership. (*Id.* at 7–8.) The Defendants argue that because Mr. Karagosian was an agent for NATO and its members, common law duties of confidentiality apply to create an ongoing obligation of confidentiality for Mr. Karagosian. (Dkt. No. 53 at 8.)

Furthermore, the Defendants argue that even if Mr. Karagosian was not their agent, a confidential relationship existed because Mr. Karagosian and these three Defendants shared "a longstanding series of interactions, which have more likely than not coalesced to create a basic understanding of [the Defendants'] modus operandi, patterns of operations, decision-making process, and the like" regarding digital cinema. *See Koch*, 85 F.3d at 1182. As such, the Defendants argue that Mr. Karagosian has a duty to protect the Defendants confidential information and that this duty precludes him from serving as Intertrust's expert witness in this case. (Dkt. No. 53 at 8–10.)

The Defendants further argue that Mr. Karagosian received the Defendants' confidential information as a consultant for NATO. (*Id.* at 10–11.) According to the Defendants, Mr. Karagosian's primary role with NATO was to represent its members on issues relating to the development of, and transitioning to, digital cinema—the same aspect of the Defendants' businesses accused of infringement in this case. (*Id.*) In addition, the Defendants submitted two sworn declarations of John Fithian, NATO's President and CEO. Defendants contend these support their allegation that Mr. Karagosian "received, exchanged, and was privy to confidential information of NATO and its members" which included the Defendants. (*Id.*) The Defendants also contend the JDCA evidences Mr. Karagosian received confidential information.[4] (*Id.*)

---

[4] As noted earlier, Defendants have not presented the JDCA as evidence in this matter, other than quoting a single paragraph from the JDCA in Mr. Fithian's Second Declaration. (Dkt. No. 59-1 ¶ 9.)

Finally, the Defendants argue that Intertrust will not be unduly prejudiced by the disqualification of Mr. Karagosian because Intertrust has already retained and cleared six additional experts under the Stipulated Protective Order (Dkt. No. 40), and should any of those experts be insufficient, Intertrust may seek and retain a new expert as the expert report deadline is more than three months away. (*Id.* at 11.)

### ii.   Intertrust's Arguments

Intertrust argues that the Defendants have not met their burden of proof to show that disqualification is warranted. First, Intertrust argues that the Defendants have not shown that the first element of the *Koch* two-part test has been met. Intertrust points out that the Defendants have not presented evidence from even a single employee or former employee of any of these three Defendants who has testified as to a confidential relationship between any Defendant and Mr. Karagosian. Further, Intertrust argues that any belief by Mr. Fithian that the Defendants were in a confidential relationship with Mr. Karagosian is objectively unreasonable. (Dkt. No. 54 at 6–7.)

As to prong one, Intertrust contends there are four reasons why it is not objectively reasonable for the Defendants to assert a confidential relationship existed. (*Id.* at 6–9.) First, the Defendants did not employ Mr. Karagosian. (*Id.*) Mr. Karagosian's consulting firm, MKPE, was engaged by NATO as an independent contractor to represent NATO and its several hundred members. (*Id.*) Second, as a consultant Mr. Karagosian was retained by NATO to serve as a conduit, not a vault, for information. Mr. Karagosian worked with NATO to facilitate communication between NATO and its members, SMPTE, and DCI. (*Id.* at 7.) Third, the Defendants could not have reasonably thought they had a confidential relationship with Mr. Karagosian because any information shared with Mr. Karagosian could have been and was expected to be disclosed to DCI for the purpose of drafting documents to be disclosed to the public,

7

and which documents were disclosed to the public. (*Id.* at 8.) Lastly, NATO is a trade organization comprised of the Defendants' competitors; thus, any disclosure of the Defendants' confidential information within NATO was also a disclosure to the Defendants' competitors. (*Id.*) Intertrust argues that the idea that the Defendants had a confidential relationship with Mr. Karagosian allowing for the protected flow of confidential information in the presence of their competitors is simply not plausible, and insufficient to carry the Defendants' burden of proof. (*Id.*)

As to the second prong, Intertrust argues that Mr. Karagosian did not receive the Defendants' relevant and significant confidential information. (*Id.* at 9.) Intertrust contends that Mr. Fithian's declarations (Defendants' only evidence before the Court) do not establish that Mr. Karagosian was privy to any of the Defendants' relevant and confidential information because it provides none of such information nor the context necessary to determine whether specific information relevant to this litigation was shared with Mr. Karagosian. (*Id.* at 9–10.) Intertrust argues that the Defendants' allegation that Mr. Karagosian received confidential information regarding "business strategy and proposed technical standards" is too vague and imprecise to meet the Defendants' burden of proof. (*Id.* at 10.) Additionally, Intertrust emphasizes that the Defendants have not produced any of the "confidential reports" or even suggested *in camera* review of these reports, so as to establish the existence of the confidential information that Mr. Karagosian allegedly received. (*Id.* at 12–13.)

Lastly, Intertrust argues that public policy considerations do not support disqualification of Mr. Karagosian since there is no established conflict of interest or tangible evidence showing that Mr. Karagosian received confidential information. (*Id.* at 14–15.) Also, even though there is time for Intertrust to find another expert, Intertrust maintains that they are unaware of any other industry experts with experience commensurate with Mr. Karagosian's. (*Id.* at 15.)

### B. Discussion

#### i. The Defendants did not have a confidential relationship with Mr. Karagosian.

The Court is persuaded that even though Mr. Karagosian was associated, through MKPE, as an independent contractor with NATO from 2000 to 2011, this association did not place him in a confidential or agency relationship with the Defendants, and accordingly he should not be disqualified as an expert witness in this case.

No confidential or agency relationship existed between Mr. Karagosian and the Defendants for several reasons. First, Mr. Karagosian was retained as a consultant because of his membership within standard setting committees in SMPTE and the open lines of communication this created with DCI. As such, Mr. Karagosian's role was to educate the exhibition industry (i.e. NATO's entire membership—including the Defendants) on what was happening regarding the digital standards development conducted by DCI and SMPTE and to present NATO's input to the respective committees within DCI and SMPTE where he was an active member. Mr. Karagosian's role was not to represent and advocate for NATO's interests, but rather to be a sounding board, a conduit, and a source of information for NATO and all its several hundred members.

Second, during his time as an independent consultant for NATO, Mr. Karagosian was never asked to avoid engagements with other entities, and Mr. Karagosian has never been individually engaged by any of the Defendants. This makes establishing an agency relationship within these facts nearly impossible. Third, Mr. Karagosian signed the JDCA on behalf of his consulting firm, MKPE Consulting, and not as an individual. Also, Mr. Karagosian only attended one meeting that was purportedly conducted pursuant to the protections of that agreement and, in any event, any

information shared with Mr. Karagosian at that meeting has since been made public. The Court has little choice but to consider the JDCA a red herring, since Defendants obviously have the document but have failed to present it to the Court. Further, their efforts to quote only a single paragraph from it in their briefing while not attaching it makes it more suspect and not less.

Lastly, the Defendants could not have had an objectively reasonable basis to believe they had a confidential relationship with Mr. Karagosian when he was retained to provide information to and participate in discussions with the Defendants and all of their competitors on a collective and interactive basis. Any information the Defendants shared with Mr. Karagosian in his capacity as a consultant for NATO would have been available to their competitors and could hardly be part of a confidential relationship.

Moreover, it is undisputed that the Defendants did not share a confidential relationship separately or solely with Mr. Karagosian as their agent. Mr. Karagosian was neither an employee or agent of the Defendants. He was, at all times, a principal in a consulting firm hired by NATO—no more and no less. NATO is comprised of its own governing body which had the power to direct Mr. Karagosian's firm and its activities. Only NATO could determine what information Mr. Karagosian could and could not disclose. In the absence of any direct relationship and without any power to direct Mr. Karagosian's activities, the Defendants' relationship to Mr. Karagosian was far too tenuous for him to be treated as their agent. Accordingly, the Defendants did not have a confidential relationship with Mr. Karagosian.

    **ii.    The Defendants have failed to prove Mr. Karagosian received confidential information.**

Even if the Defendants had a confidential relationship with Mr. Karagosian, which the Court finds they did not, these Defendants have failed to carry their burden of proving that Mr.

Karagosian received confidential information relevant to this case. The Defendants have not submitted any evidence which shows that confidential information was disclosed to Mr. Karagosian. The Defendants allege that communications with Mr. Karagosian pertained to "(a) the advantages and disadvantages of potential digital cinema technology, equipment, architectures, and systems, including security and anti-pirating measures; (b) proposed and potential standards relating to such matters, including the development of DCI's Digital Cinema System Specifications; and (c) critical business and economic issues confronting NATO's members arising from the move to convert the movie industry from 35mm film presentation to digital cinema," but they provide no further support for such allegations.[5] Tellingly, the Defendants have not sought to file under seal or sought *in camera* review of any specific confidential information that Mr. Karagosian received.

The Defendants rely on *Lake Cherokee Hard Drive Techs., LLC v. Bass Computers, Inc.*, to suggest that Mr. Karagosian had access to confidential business information related to this case. No. 2:10-cv-216-JRG, 2012 WL 708354, at *2–3 (E.D. Tex. Mar. 5, 2012). However, the facts and circumstances of *Lake Cherokee* differ significantly from this case. In *Lake Cherokee*, the expert in question had been previously <u>directly employed</u> by the moving defendant, subject to a general Non-Disclosure Agreement, and the moving defendant submitted a sealed declaration from an employee competent to speak with personal knowledge about the expert's access to confidential information. *See id.* These facts are a far cry from the tenuous and indirect relationship between the Defendants and Mr. Karagosian, and they are a far cry from the clear absence of evidence

---

[5] The Defendants submitted a Second Declaration of John Fithian as Exhibit A to their Reply Brief (Dkt. No. 59) in support of these allegations. Regardless of whether this information is new evidence submitted on reply or simply a rebuttal, the Court finds the Declaration insufficient to prove *what* was allegedly divulged as confidential information, and *when*, *why*, or *how* Mr. Karagosian received such information. Additionally, Mr. Fithian is the CEO of NATO. He has no direct legal relationship with the Defendants. It strains credibility to believe Mr. Fithian retains knowledge of *the Defendants'* purportedly confidential information that was disclosed to Mr. Karagosian. Rather, if Mr. Fithian and NATO knew it, it is nonconfidential—almost by definition.

regarding specific circumstances and proof of actually disclosed confidential information which has not been presented here.

Additionally, although the JDCA might suggest that Mr. Karagosian may have at one time been privy to confidential information, the Defendants have not produced that agreement, nor have they produced any evidence of discussions pursuant to it. The fact that the JDCA exists does nothing to relieve the Defendants of their burden of proving that relevant, confidential information was in fact conveyed to Mr. Karagosian. The Defendants bear that burden, and they have failed to carry it.

### iii. Public Policy considerations do not support disqualifying Mr. Karagosian.

Public policy considerations do not support disqualifying Mr. Karagosian because Mr. Karagosian's consulting with NATO does not give rise to a conflict of interest with the Defendants. Mr. Karagosian was not an agent of the Defendants, and the Defendants have not proven Mr. Karagosian received their confidential information. Under these facts, no public policy supports his disqualification. The Court believes that disqualifying Mr. Karagosian under these sparse circumstances would materially but improperly broaden the scope of expert disqualification, and this Court declines to do so. Public policy disfavors depriving Intertrust of an expert witness with specialized and unique expertise, absent concrete proof of a specific conflict of interest. Public policy considerations in this case weight against the Defendants.

## IV. CONCLUSION

In light of the foregoing and for the reasons set forth herein, the Court finds the Defendants Motion for Protective Order should be and hereby is **DENIED**. Mr. Karagosian is to be subject to the Stipulated Protective Order in this case and may serve, under the rules of this Court and the Federal Rules of Civil Procedure, as an expert witness in this case. However, nothing in this

opinion limits Defendants' prerogative to bring a proper *Daubert* challenge to Mr. Karagosian at a later time.

**So ORDERED and SIGNED this 8th day of May, 2020.**

                                                RODNEY GILSTRAP
                                                UNITED STATES DISTRICT JUDGE